IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| ARTHUR ELIZONDO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | ) CIVIL ACTION NO. SA-04-CA-1025-FB |
| | ) |
| FLETCHER PARKS, | ) |
| | ) |
| Defendant. | ) |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court are Defendant's Motion for Summary Judgment (docket #48), Plaintiff's Response to Defendant's Motion for Summary Judgment (docket #53), Defendant's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment (docket #63), Plaintiff's Sur-Reply to Defendant's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment (docket #66), Plaintiff's *Garcetti v. Ceballos* Brief (docket #79), and Defendant's *Garcetti* Brief (docket #80). Defendant Fletcher Parks seeks summary judgment on the only remaining claim in this case, plaintiff's First Amendment retaliation claim, based upon qualified immunity.

### I. Background

Plaintiff, Arthur Elizondo, was employed by the University of Texas at San Antonio ("UTSA") from 1987 until his termination on November 11, 2002. At the time of his termination, plaintiff was employed as a Business Development Specialist at UTSA Minority Business Development Center ("UTSA-MBDC"). UTSA-MBDC was created and primarily funded by a federal grant from the Minority Business Development Agency ("MBDA"), a subdivision of the United States Department of Commerce. Plaintiff's position, as well as the other UTSA-MBDC

employees, was dependent upon grant funds.

In 2002, defendant Fletcher Parks was the director of UTSA-MBDC and one of plaintiff's supervisors. In September 2002, defendant learned the UTSA-MBDC program was going to suffer a budget shortfall, and he would need to "adjust" personnel appointments accordingly. Defendant met with several UTSA employees from various departments to discuss options in light of the projected shortfall. Ultimately, a plan was arranged in which plaintiff and another UTSA-MBDC employee, Luther Ortega, would be temporarily transferred to work for the UTSA Small Business Development Center ("UTSA-SBDC") from October 1, 2002 until December 31, 2002.

On October 18, 2002, defendant informed plaintiff and Mr. Ortega of the temporary reassignment. Mr. Ortega accepted the reassignment. According to defendant, plaintiff did not want to be reassigned because he did not want to work for Judy Ingalls (the Director of UTSA-SBDC), did not want two supervisors, and was concerned he would have increased work responsibilities.

On October 24, 2002, plaintiff was again informed of UTSA-MBDC's financial position and defendant accepted an agreement with UTSA-SBDC to allow plaintiff's position to be paid by UTSA-SBDC. Plaintiff was informed his duties and responsibilities "would remain the same as a construction/procurement specialist, and [he] would continue to report to [defendant] except that the [UTSA-SBDC] would receive credit for counseling hours as well as the economic impact of those services."

In October 2002, plaintiff alleges he told defendant he would not transfer. Plaintiff stated: "I would not do it because it could create fraud, and it would - and by creating fraud, you would be billing both Department of Commerce and the Small Business Administration, and I was not going to be a part of the - to do that just to recover the $70,000 [budget shortfall] loss." Additionally,

plaintiff alleges he called Raquel Suniga, a Minority Business Development Agency (MBDA) employee, to report the fraud. He also claims he called a Department of Commerce hotline to inquire as to the process for filing a claim to report the illegal activity. Plaintiff further claims he contacted various attorneys to discuss the situation.

On October 31, 2002, defendant sent a memorandum to plaintiff whereby he requested plaintiff inform him by November 1 if he would accept the new assignment or whether "his previous decision not to accept the assignment still stands." The following day, plaintiff responded: "[I need] more time to review this matter with legal before I can respond to this important matter. I know that you would request the same, especially since this memo indicates that my job position is in jeopardy and other references made in this memo bring up several questions that need full responses and complete answers, so that my 15 years and 2 months, plus my retirement are not in jeopardy." Plaintiff's response also included a postscript referencing anti-discrimination and anti-harassment policy. Ultimately, plaintiff never agreed to the temporary transfer and was terminated on November 11, 2002 for his "failure to cooperate with supervisor, refusal to follow instructions and [his] refusal to perform [his] assigned duties."

Plaintiff filed this lawsuit on November 10, 2004, against UTSA and Fletcher Parks, individually and in his official capacity. On April 7, 2005, the Court granted in part and denied in part defendants' motion to dismiss, and the Court granted defendants' motion for judgment on the pleadings. As a result of that Order, the only remaining claims were the 31 U.S.C. §3730(h) claim and the First Amendment retaliation claim against defendant Parks. Subsequently, plaintiff and defendant Parks filed Motions for Summary Judgment. On December 5, 2005, the Court denied plaintiff's motion, and denied in part and granted in part defendant's motion. The Order disposed

of all claims except plaintiff's First Amendment retaliation claim against defendant Parks in his individual capacity.

Defendant filed an interlocutory appeal with the United States Court of Appeals for the Fifth Circuit. On November 9, 2007, the Fifth Circuit vacated the December 5, 2005 Order denying qualified immunity and remanded the case for reconsideration of the First Amendment retaliation claim in light of *Garcetti v. Ceballos*, 547 U.S. 410 (2006) (docket #74). The Fifth Circuit explained: "Because *Garcetti* had not been decided at the time the district court made its ruling in this case, the district court did not have the opportunity to decide whether Elizondo was speaking pursuant to his official duties." (docket #74)

Upon remand, United States District Court Judge Xavier Rodriguez, who had presided over this case up until that time, signed an order of recusal, and the case was subsequently transferred and reassigned to my docket. Pursuant to the Fifth Circuit's Order, this Court entered an Order and Advisory for a briefing schedule on the First Amendment issue. Both parties have filed, and the Court has reviewed, the pertinent briefs addressing *Garcetti v. Ceballos*.

## II.  Summary Judgment Standard

Rule 56 of the Federal Rules for Civil Procedure provides that a party may move for summary judgment on a claim or defense and that a judgment should be rendered if the pleadings, discovery on file, and affidavits show that there is no genuine issue as to any material fact. FED. R. CIV. P. 56. In order to establish that there is no genuine issue of material fact, the movant must either submit evidence that negates the existence of some material element of the nonmoving party's claim or defense, or, if the issue is one for which the nonmoving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element

4

of the nonmovant's claim or defense. *Lavespere v. Niagra Machine & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990), *cert. denied*, 510 U.S. 859 (1993). The moving party bears the initial burden to establish the absence of a genuine issue of material fact. *Ceoltex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If the moving party fails to meet its initial burden, the motion should be denied, regardless of the nonmovant's response. *Quorum Health Res. L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 471 (5th Cir. 2002). "'[T]he party opposing the motion...bears the burden of responding *only after* the moving party has met its burden of coming forward with proof of the absence of any genuine issues of material fact.'" *Ceoltex Corp.,* 477 U.S. at 322 (citation omitted). In deciding a motion for summary judgment, the court draws all reasonable inferences in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### III. First Amendment Retaliation Claim

Defendant has moved for summary judgment as to plaintiff's First Amendment claim and has asserted a defense of qualified immunity. The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It is the plaintiff's burden to overcome a defendant's assertion of qualified immunity. *Saldana v. Garza*, 684 F.2d 1159, 1163 (5th Cir. 1982), *cert. denied*, 460 U.S. 1012 (1983). In determining whether an official is entitled to qualified immunity, two separate inquiries are conducted. The first is whether the facts alleged show that the defendant's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson v. Callahan*, — U.S. —, 129 S. Ct. 808 (2009). The next inquiry is whether the right violated was clearly established at the time. *Id*. at 815-16. While appropriate to

answer these inquiries sequentially, courts enjoy "discretion in deciding which of the two prongs of qualified immunity analysis should be addressed first." *Pearson*, 129 S. Ct. at 818.

The constitutional right in question - freedom of speech - is protected by the First Amendment under Section 1983. Plaintiff claims he was terminated from his employment in retaliation for engaging in protected speech. In order to prove such a claim, plaintiff must establish: 1) he suffered an adverse employment action; 2) he spoke as a citizen on a matter of public concern; 3) his interest in the speech outweighs the government's interest in the efficient provision of public services; and 4) his speech precipitated the adverse employment action. *Nixon v. City of Houston*, 511 F.3d 494, 497 (5th Cir. 2007) (citations omitted). Moreover, the decision in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), established an additional threshold in terms of whether a public employee's speech will garner First Amendment protection. *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 692 (5th Cir. 2007).

In *Garcetti*, the plaintiff, Richard Ceballos, was a deputy district attorney for the Los Angeles County District Attorney's Office. *Garcetti*, 547 U.S. at 413. Mr. Ceballos was asked to review inaccuracies in an affidavit used to obtain a search warrant. *Id*. After concluding the affidavit had misrepresentations, he relayed this verbally to his supervisors and followed up his communications with a memorandum. *Id*. at 414. The prosecution moved forward, and Mr. Ceballos was called as a witness by the defense regarding his observations of the affidavit. *Id*. at 414-15. Subsequent to his actions, Mr. Ceballos claims he was subjected to multiple retaliatory actions which included reassignment, transfer to another courthouse, and denial of a promotion. *Id*. at 415. Mr. Ceballos filed suit asserting a Section 1983 claim alleging he was subject to adverse employment actions in retaliation for engaging in free speech.

The *Garcetti* Court held, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes and the Constitution does not insulate their communications from employer discipline." *Id*. at 421. The Court recognized some factors which guided its reasoning. First, the Court acknowledged the memorandum in question was expressed internally to Mr. Ceballos' supervisors. *Id*. at 420. Additionally, the subject matter of the memorandum concerned Mr. Ceballos' employment. *Id*. at 421. While these factors were noted, the Court explained neither factor was dispositive. *Id*. at 420-21. "The controlling factor in Ceballos' case is that his expressions were made pursuant to his duties as a calendar deputy." *Id*. at 421. Namely, Mr. Ceballos authored the memorandum because it was one of the numerous duties for which he was employed. *Id*.

In the present suit, plaintiff alleges his Section 1983 retaliation claim stems from the following speech: 1) he told defendant that the scheme to transfer him was illegal and fraudulent; 2) he called Raquel Suniga at the MBDA to report the illegal activity; 3) he began speaking with legal counsel; and 4) he called a Department of Commerce hotline and spoke with an investigator as to the process of reporting the fraud. Insofar as this speech was made pursuant to plaintiff's official duties, *Garcetti* provides such expressions do not garner First Amendment protection. Each of the alleged episodes of speech will be examined separately.

A.     Direct Communications with Parks

Plaintiff claims after being made aware of the budget deficit of UTSA-MBDC, defendant explained a plan in which plaintiff and Mr. Ortega would be transferred to UTSA-SBDC for the remainder of the calendar year. On numerous occasions, plaintiff alleges, and defendant denies, plaintiff told defendant the proposed transfer is illegal and fraudulent.

Under *Garcetti*, the question becomes whether plaintiff made these comments in the course of performing his job as a Business Development Specialist. Plaintiff argues reporting fraud and illegal activity are not his job duties. In fact, he provides an affidavit and attaches a formal job description for his employment position noting that no such activity is included in the description.

*Williams v. Dallas Independent School District*, examined further the *Garcetti* ruling and the meaning of acting pursuant to one's official duties. 480 F.3d 689 (5th Cir. 2007). Gregory Williams was the athletic director and football coach for a Dallas area high school. *Id*. at 690. Coach Williams, dissatisfied with the manner in which fund accounting and disbursement were taking place within his school, wrote a string of memos to the school's office manager and the principal. After his termination, Coach Williams filed a Section 1983 retaliation suit. *Id*. at 691. The *Williams* court acknowledged the typical inquiry regarding protected speech would apply a balancing test; however, the "Supreme Court's recent pronouncement in *Garcetti v. Ceballos* added a threshold layer to the *Pickering* balancing test." *Id*. at 692. The focus shifts under *Garcetti* "from the content of the speech to the role the speaker occupied when he said it." *Id*.

Coach Williams wrote a memo that was not required of him, the focus of the memo concerned his daily operations, and his speech was made internally to his supervisor. *Id*. at 694. The court concluded Coach Williams' speech was made in the course of his employment, and therefore, First Amendment protection was not obtained. *Id*.

Here, it is undisputed plaintiff was called to a meeting by his supervisor, defendant, to discuss the budget shortfall and the temporary reassignment. It was at this meeting, along with several other separate discussions and writings, that plaintiff and defendant discussed the assignment, the manner of plaintiff's pay, and the new or continued duties for plaintiff under the

8

temporary assignment. Amid these discussions is when plaintiff allegedly informed defendant the plan was illegal and fraudulent.

In summary, plaintiff's speech was made pursuant to a meeting called by his supervisor. The subject matter of the speech concerned the manner of plaintiff's continued employment; i.e., how he was to be paid, his duties, and to whom he answered for supervision. Certainly official duties of any job would include meeting with one's supervisors, if any, to discuss new assignments and the manner in which one continues employement. While reporting fraud and the illegal use of government funds are clearly matters of public importance, "[e]ven if the speech is of great social importance, it is not protected by the First Amendment so long as it was made pursuant to the worker's official duties." *Williams*, 480 F.3d at 692. Because the communications between plaintiff and defendant were performed pursuant to plaintiff's official duties, the speech is not afforded constitutional protection.

B.      Communications with Raquel Suniga

Plaintiff claims he called Raquel Suniga at the MBDA Regional Office and informed her of the activity at UTSA-MBDC he believed to be illegal. Plaintiff argues this type of external whistleblowing is precisely the type of speech protected under Section 1983. Defendant asserts plaintiff has provided no evidence of any such communication prior to the termination; therefore, the speech could not have been the motivating factor to terminate plaintiff.

While case law illustrates external as opposed to internal speech more readily is proteced by the First Amendment, plaintiff's communications herein are afforded no such refuge. *See Davis v. McKinney*, 518 F.3d 304 (5th Cir. 2008) (providing cases from other circuits all illustrating complaints made internally up the chain of command relating to one's job fall within an employee's

official duties and are not protected under the First Amendment). An element of plaintiff's retaliation claim is the speech motivated the termination. *Nixon v. City of Houston*, 511 F.3d 494, 497 (5th Cir. 2007). Defendant argues plaintiff has no evidence defendant had any knowledge of the communications with Ms. Suniga; thus, the termination could not have been the result of any such communications. On the contrary, Ms. Suniga's affidavit illustrates she did not contact defendant to discuss any information provided to her by plaintiff until after plaintiff was released from employment. Further, Judge Rodriguez addressed this issue in the December 5, 2005 Order stating: "Plaintiff presents no evidence that Parks was aware of any such call or complaint." This Court agrees and reaches the same conclusion: plaintiff has failed to offer any evidence which creates a material fact as to defendant's knowledge of the communications with Ms. Suniga. As a result, these communications do not receive constitutional protection.

C.     Communications Regarding Legal Counsel

Plaintiff alleges multiple incidents relating to communications with legal counsel form the basis of his claims for First Amendment protection. Plaintiff asserts he sought legal advice and contacted Cynthia Mitchell of UTSA's general counsel's office. Nevertheless, plaintiff states he "did not make a fraud complaint with Ms. Mitchell and her legal office." Plaintiff did, however, contact a private attorney to "learn how to report Mr. Parks's [sic] fraud to the appropriate government authorities and to pursue the legal rights available to [him] under the law."

Regarding the above communications, there is nothing to suggest defendant had any knowledge of these communications. Hence, these communications could not have precipitated plaintiff's termination. *See Moreno v. Texas A&M Univ. - Kingsville*, No. CIV-A-C-03-500, 2006 WL 3030713 *3 (S.D. Tex. Oct. 20, 2006) (mem. op.) (concluding the determination of whether a

plaintiff's speech precipitated the adverse employment action includes an inquiry of whether the "defendants knew of plaintiff's speech...").

The only evidence in the record as to defendant's knowledge of plaintiff having communications with an attorney are from a memo plaintiff drafted in response to defendant's memo asking plaintiff if he will accept the temporary transfer and to advise of a decision by the following day. Plaintiff replied he "would need more time to review this matter with legal before [he] can respond to this important matter." Although this speech is categorized with the communications concerning legal counsel, the analysis here is identical to that in Subsection A above. Namely, plaintiff's memo here was drafted as part of plaintiff's official duties. The memo from defendant initiated plaintiff's direct response. The subject matter again included topics regarding plaintiff's duties and supervision. Analogous to the memo drafted in *Garcetti*, plaintiff's "speech" was written pursuant to his official duties. The memo was drafted as a direct response to his supervisor's inquiry and the memo was purely internal in nature.

D.     Communications with the Department of Commerce

Plaintiff contends prior to termination he was "in the process of putting together a formal fraud complaint with the United States Department of Commerce...." Part of this process included a call to the United States Department of Commerce fraud hotline and speaking with an investigator about the procedure to make a formal complaint. It is undisputed a formal complaint was not made until after his termination, and the record contains no evidence to suggest defendant had knowledge of plaintiff's communications with the Department of Commerce prior to termination. Without knowledge of these communications, the required causal link for a retaliation claim between the speech and the adverse employment action is missing. *See Moreno v. Texas A&M Univ. - Kingsville*,

No. CIV-A-C-03-500, 2006 WL 3030713 *3 (S.D. Tex. Oct. 20, 2006) (mem. op.) (concluding that because defendants did not know of the plaintiff's speech, the speech could not have precipitated the termination).

### IV. Conclusion

The single remaining claim in this suit is plaintiff's First Amendment retaliation claim under 42 U.S.C. § 1983.  This claim is before the Court pursuant to defendant's Motion for Summary Judgment asserting a defense of qualified immunity.  Plaintiff's direct communications with defendant are those that are not afforded First Amendment protection pursuant to *Garcetti* and its progeny.  Specifically, these allegations were made pursuant to plaintiff's official duties.  The communications were made internally and at meetings set up by plaintiff's supervisors to discuss his continued employment and temporary transfer.  The other episodes of "speech" all fail to harbor First Amendment protection for the additional reasons cited herein.  Plaintiff cannot establish a violation of his constitutional rights.  As a result, this Court finds Fletcher Parks is entitled to summary judgment on his defense of qualified immunity as a matter of law.

Accordingly - IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment is GRANTED as to plaintiff's remaining First Amendment retaliation claim.  It is FURTHER ORDERED that this case is DISMISSED.  Motions pending, if any, are dismissed.

It is so ORDERED.

SIGNED this 12 day of July, 2010.

_____
FRED BIERY
CHIEF UNITED STATES DISTRICT JUDGE